1   **WO**

2

3

4

5

6   IN THE UNITED STATES DISTRICT COURT

7   FOR THE DISTRICT OF ARIZONA

8

9   Rocket  Acquisition  Corporation,  a)    No. CIV 07-1278-PHX-MHM
    Delaware Corporation                  )
                                          )    **ORDER**
10              Plaintiff,                )
                                          )
11  vs.                                   )
                                          )
12                                        )
    Ventana  Medical  Systems,  Inc.,  a)
13  Delaware  Corporation;  and  Terry)
    Goddard, Attorney General of the State of)
14  Arizona                               )
                                          )
15                                        )
                Defendants.               )
16                                        )
    _____)
17

18          Currently before the Court is Plaintiff Rocket Acquisition Corporation's ("Plaintiff

19  or "Rocket") Motion for Preliminary Injunction. (Dkt.#3).  After reviewing the papers and

20  holding oral argument on August 21, 2007, the Court issues the following Order.

21  **I.    Background**

22          Plaintiff's  Complaint  and  Motion  for  preliminary  injunction  challenge  the

23  constitutionality of certain provisions of the Arizona Anti-Takeover Act. A.R.S. §§ 10-2701

24  to 2743.  Specifically, Plaintiff challenges A.R.S. §§ 10-2721 through 10-2727 (the "Arizona

25  Control  Share  Act")  and  A.R.S.  §§  10-2741  through  10-2743  (the  "Arizona  Business

26  Combination Act") (collectively "the Arizona statutes") and contends that such provisions

27  violate Article I, Section 8, Clause 3 of the United States Constitution (the "Commerce

28  Clause").

Plaintiff is a Delaware corporation that has been formed for the purpose of making a tender offer for all of the common stock of Defendant Ventana Medical Systems, Inc, ("Defendant" or "Ventana"). Plaintiff is a wholly owned subsidiary of Roche Holding Ltd. ("Roche"), a Swiss Company, involved in the pharmaceutical industry. Defendant is also a Delaware corporation with its principal place of business in Tucson, Arizona. Defendant Ventana is involved in medial research technology and develops and manufactures specialized devices for medial research laboratories.

On June 25, 2007, Plaintiff issued a press release announcing its intent to commence an all-cash offer for all of the outstanding shares of Defendant at the price of $75 net per share. On June 27, 2007, Plaintiff formally commenced the tender offer, which was originally scheduled to expire on July 26, 2007.[1]  According to Plaintiff, the tender offer is the first step in a proposed two-step transaction. If the tender offer is successful, Plaintiff states that it will be followed by a merger between Plaintiff and Defendant.

## A.    Significance of the Arizona Statues at Issue

As an initial matter, the Arizona Anti-Takeover Act, A.R.S. §§ 10-2701 to 2743, regulates the activities of "issuing public corporation[s]." Specifically, A.R.S. § 10-2701(11) defines an "issuing public corporation" to include corporations "incorporated under the laws of this state" or

> [h]as its principal place of business or its principal executive office located in this state and owns or controls assets located within this state that have a fair market value of at least one million dollars and has more that five hundred employees residing in this state.

Plaintiff asserts and neither Defendant Ventana nor the Attorney General contest that Defendant Ventana, a Delaware corporation, qualifies as an "issuing public corporation" based upon its principal place of business in Arizona, the fair market value of its assets and the number of employees employed in Arizona. While the Arizona Takeover Act has a provision that allows a foreign corporation to opt out by amending its bylaws or by

---

[1]It appears the tender offer has been extended to August 23, 2007.

shareholder amendment to its articles, Defendant has not elected that option. See A.R.S. §§ 10-2721(A)(2), 10-2743(A)(2).

**(1)    The Arizona Control Share Act and the Arizona Business Combination Act**

The Arizona Control Share Act regulates the voting rights of shares acquired in a "control share acquisition" which applies to the acquisition of an "issuing public corporation's" shares, which, when added together to all other shares owned by the acquiring entity entitle it to exercise at least 20%, or at least 33%, or more than 50% of the target corporation's voting power.  See A.R.S. § 10-2701(9).  The Arizona Control Share Act goes on to direct that any shares acquired in a "control share acquisition" that exceed the thresholds of voting power described above do not have the right to vote matters affecting the corporation, save elections of directors, unless approved by a majority of the shareholders.  See A.R.S. § 10-2725(A).

The Arizona Business Combination Act regulates certain "business combinations," including mergers between "issuing public corporation[s]" and "interested shareholder[s]." An "interested shareholder" includes any person that beneficially owns 10% or more of the shareholder voting power of the corporation.  See A.R.S. § 10-2701(10).  The Arizona Business Combination Act goes on to prohibit an "interested shareholder" from engaging in a "business combination" or merger with an "issuing public corporation" for three years after becoming an "interested shareholder" unless, prior to the date the person has become an "interested shareholder" a committee comprised of disinterested directors from the "issuing public corporation" approves either the acquisition of shares made by the "interested shareholder" or the proposed "business combination" or merger. See A.R.S. § 10-2741(A).

Plaintiff contends that because Defendant Ventana, a Delaware corporation, satisfies the definition of an "issuing public corporation" the Arizona Anti-Takeover Act applies to Defendant and the relevant tender offer made by Plaintiff to Defendant.  As such, if the tender offer is successful it would result in the acquisition of more than 50% of the common stock of Defendant Ventana by Plaintiff and as a result:

- 3 -

(1)    the Arizona Control Share Act would prevent Plaintiff from voting the vast majority of its shares acquired in most situations; and

(2)    the Arizona Business Combination Act would prevent Plaintiff from completing the merger (the second step of the transaction) for at least three years.

(Plaintiff's Motion, p. 7).

Plaintiff contends that such conditions imposed by the Arizona Anti-Takeover Act run contrary to the Commerce Clause of the United States Constitution, because they constitute an impermissible risk of inconsistent regulation by different States and/or impose excessive burdens on interstate commerce.

In response to Plaintiff's position, Defendant and the Attorney General have asserted a two prong defense. First, Defendant contends that because of the low tender price offered by Plaintiff that the case is not ripe for judicial review and even if ripe, there is no immediate harm that warrants the issuance of a preliminary injunction. Second, the Attorney General, now intervening in this matter, contends that the Arizona Control Share Act and Arizona Business Combination Act are constitutionally sound and do not run afoul of the Commerce Clause. [2]

## III.    Analysis

### A.    Ripeness of Plaintiff's Challenge

"[R]ipeness is 'peculiarly a question of timing,' designed to 'prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements.'" Thomas v. Anchorage Equal Rights Com'n, 220 F.3d 1134, 1138 (9th Cir. 2000) (citations omitted). A determination of judicial ripeness encompasses both an Article III constitutional and prudential component. See id. First, the constitutional component demands that a plaintiff "face 'a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement'" and not merely an "imaginary" or "speculative" injury.

[2] On August 14, 2007, this Court approved a stipulation between Plaintiff and the Attorney General to dismiss the Attorney General with leave for the Attorney General to intervene to defend the constitutionality of the Arizona statutes. (Dkt.#31). The Attorney General has done so with his August 8, 2007 response to Plaintiff's Motion. (Dkt.#22).

1    <u>Id.</u> (citation omitted).  Second, the prudential aspect of ripeness serves as a "tool that courts

2    may use to enhance the accuracy of their decisions and to avoid becoming embroiled in

3    adjudications that may later turn out to be unnecessary. . . ." <u>American Sav. Bank v. UBS</u>

4    <u>Fin. Servs.</u> 347 F.3d 436, 440 (2d Cir. 2003).  The prudential analysis includes a two-

5    pronged inquiry: (1) the "fitness of the issues for judicial decision" and (2) "the hardship to

6    the parties of withholding court consideration." <u>Thomas</u>, 220 F.3d at 1141 (citations

7    omitted).

8         Defendant contends that the Court need not reach the constitutional issue  regarding

9    the Arizona statutes associated with Plaintiff's Motion for preliminary injunction because

10   Plaintiff's request for declaratory and injunctive relief is not ripe for judicial review. In

11   support of this argument Defendant cites what it describes as the "underwater" tender offer

12   made by Plaintiff to Defendant.  Defendant cites the $75 per share tender offer made by

13   Plaintiff in conjunction with the fact that immediately after Plaintiff's tender offer on June

14   25, 2007, Defendant's share price spiked to $76 per share and on July 10, 2007, Defendant's

15   share price closed at $80 per share and has not closed below $80 per share since the offer.

16   Defendant further notes that on August 7, 2007, the last full trading day before Defendant

17   filed its responsive brief, Defendant's share price closed at $81.67, almost $7 higher than

18   Plaintiff's tender offer of $75 per share.  Defendant also notes that Defendant possesses

19   approximately 33,688,000 shares of common stock and despite the fact that Plaintiff has

20   made a tender offer for all shares, at the time of Defendant's brief, only 9,936 shares had

21   been tendered.  Defendant cites these facts as evidence that Plaintiff's action is not ripe

22   because Plaintiff has not made a serious tender offer but one that will most surely be rejected.

23   Defendant also contends that because the application of the Arizona statutes hinge on a

24   contingent future event, <i>i.e.</i>, the successful completion of the tender offer, the Arizona

25   statutes do not apply because Plaintiff does not currently own the minimum number of shares

26   to trigger the Arizona Control Share Act (at least 20% ownership to qualify) or the Business

27   Combination Act (at least 10% ownership to qualify).  In other words, for the Arizona

28

1    statutes to apply, Plaintiff's tender offer will have to be successful because Plaintiff currently

2    only owns approximately 1% of Defendant's common stock.

3           Defendant's argument it is not persuasive with respect to the ripeness issue associated

4    with Plaintiff's lawsuit.  It is important to note that Plaintiff has commenced a tender offer

5    for all of Defendant's shares and that Defendant, the target corporation, is automatically

6    protected by the Arizona statutes at issue as an "issuing public corporation." Under such

7    circumstances, Plaintiff's declaratory and injunctive relief action is ripe for judicial review.

8    A review of federal authority that has addressed this issue in the context of similar

9    constitutional challenges to similar statutes evidences as much.  For instance, in Moore

10   Corp. v. Wallace Computer Servs., 898 F.Supp 1089, 1095 (D. Del. 1995), the district court

11   noted that "[c]ourts have found sufficient immediacy and reality of harm where a tender

12   offeror has commenced a tender offer and subsequently seeks to challenge the

13   constitutionality of a statute governing the transaction." (citing Black & Decker Corp v.

14   American Standard, Inc., 679 F.Supp. 1183, 1189-90 (D.Del. 1988)); see also BNS, Inc. v.

15   Koopers Co., 683 F.Supp 458, 462 n.5 (D.Del. 1988).  That is the type of action asserted here

16   by Plaintiff.  Moreover, in Grand Metro. P.L.C. v. Butterworth, 1988 WL 1045191 *4 (N.D.

17   Fla. 1988), the district found, noting that many courts before it have "recognized that

18   threatened or potential invocation of a state's anti-takeover statute presents a justiciable claim

19   for relief" held that the foreign corporation's constitutional challenge to Florida's anti-

20   takeover statute to be ripe stating "no . . . invocation or enforcement is necessary" because

21   "[b]y their own terms, the statutes will apply to the [tender offeror's] acquisition and

22   subsequent merger. . . ." Id. . The district court concluded that the controversy was "actual

23   and not hypothetical" because the plaintiff "made a serious tender offer - an offer vigorously

24   opposed by [the target] - and the success of that offer will be affected by the Florida anti-

25   takeover statutes."  Id. at * 5.    In this case, like Grand Metro, the Arizona statutes

26

27

28

1   automatically apply to Defendant and the relevant tender offer.[3]  Lastly, this Court does not

2   find persuasive Defendant's strong reliance on the difference between Plaintiff's $75 per

3   share tender offer and the current stock price of Defendant, currently trading above Plaintiff's

4   offer.  It is noteworthy that in Black & Decker, the district court was presented with a

5   situation where the value of tender offer was $2.375 below the then current market value of

6   the target corporation's stock value. 679 F.Supp at 1193.  Although the district court did not

7   squarely deal with this issue in terms of ripeness, the district court did determine the matter

8   to be ripe for judicial review. Id. at 1190-91.  Further, and more importantly, it would likely

9   be inappropriate for this Court to make some type of factual finding that Plaintiff's tender

10  offer does not pose a legitimate or serious possibility that it will be accepted by Defendant's

11  stockholders.  It is not the Court's place to substitute its judgment for the judgment of

12  Defendant's stockholders.  Even if it were this Court's place to make such a finding,

13  Plaintiff's tender offer constitutes a 44% premium above the closing price of Defendant's

14  stock value on the last full trading day before the announcement and a 55% premium above

15  Defendant's average stock value over the previous three months. At the very least, the offer

16  appears to be legitimate and serious and justifies consideration by Defendant's stockholders.

17          Thus, this Court, like others before it, finds that this matter is ripe for judicial review

18  as Plaintiff has presented a realistic claim presenting a viable risk of danger or direct injury

19  based upon the application of the Arizona statutes as well a claim that is fit for judicial

20  review taking into account the hardship imposed were this Court to defer such a ruling.

21          **B.    Preliminary Injunction Analysis**

22          The standard for granting a preliminary injunction balances the plaintiff's likelihood

23  of success against the relative hardship to the parties. To obtain a preliminary injunction, a

24  party must demonstrate either: "(1) a likelihood of success on the merits and the possibility

25  of irreparable injury; or (2) that serious questions going to the merits were raised and the

26

27          [3]In response to Plaintiff's tender offer, Defendant issued a press release stating that
    it will "rigorously resist" the tender offer and has lobbied its stockholders not to tender their
28  shares.  (Plaintiff's Reply, Dkt.#34, Maureen Beyers' Affidavit, Exhibit 1).

1   balance of hardships tips sharply in its favor. . . .  These two alternatives represent 'extremes

2   of a single continuum,' rather than two separate tests . . .  Thus, the greater the relative

3   hardship to [the party seeking the preliminary injunction,] the less probability of success

4   must be shown."  Clear Channel Outdoor, Inc. v. City of Los Angeles, 340 F.3d 810, 813 (9th

5   Cir. 2003) (citation omitted).  Courts also must consider the public interest as a relevant

6   factor.  See Carribean Marine Servs. Co. v. Baldridge, 844 F.2d 668, 674 (9th Cir. 1988).

7                    **(1)    Irreparable Harm**

8            Defendant contends that even if this matter is ripe for judicial review, the Court,

9   without visiting the merits of Plaintiff's constitutional challenge, should deny Plaintiff's

10  request for preliminary injunction because Plaintiff cannot demonstrate a "real or immediate

11  threat" of injury or irreparable harm.  Camarena v. Maricopa County Correctional Health

12  Servs., 2007 WL 899742 * 2 (D.Ariz. March 23, 2007) (J. Murguia); see also Oakland Trib.,

13  Inc. v. The Chronicle Publishing Co., 762 F.2d 1374, 1376 (9th Cir. 1985) (noting that court

14  need not reach merits of case if moving party cannot show a "significant threat of irreparable

15  harm" in the absence of an injunction).  Defendant again relies on the "underwater" stock

16  value of Plaintiff's tender offer and the unlikelihood that such a tender offer will be accepted

17  given the current value of the Defendant's stock.  Defendant notes that the harms against

18  Plaintiff of not being able to vote its shares or the delay in any merger is contingent on the

19  tender offer being approved or accepted. Thus, according to Defendant, because the tender

20  offer is so low there can be little doubt that the tender offer will be rejected, thus eliminating

21  any potential for harm against Plaintiff.

22          For many of the same reasons explained above regarding the "ripeness" of Plaintiff's

23  suit, Defendant's argument is not persuasive.  First, several courts have found injunctive

24  relief based upon the existence of irreparable harm created by the unconstitutional

25  application of a states' anti-takeover statute to be appropriate . See, e.g., Edgar v. MITE

26  Corp., 457 U.S. 624, 629 (1982) (granting preliminary injunction based upon finding that

27  Illinois business takeover statute violated commerce clause); Tyson Foods Inc. v.

28  McReynolds, 865 F.2d 99, 101 (6th Cir. 1989) (granting preliminary injunction based upon

1  finding that Tennessee anti-takeover statutes violated commerce clause); <u>Grand Metro</u>, 1988

2  at *8 (granting preliminary injunction based upon finding that Florida anti-takeover statutes

3  violated commerce clause); <u>TLX Acquisition Corp. v. Telex Corp.</u>, 679 F.Supp 1022, 1033

4  (W.D.Okl. 1987) (granting preliminary injunction based upon finding that Oklahoma Control

5  Shares Act violated commerce clause).  If this Court were not to enjoin the application of the

6  Arizona statutes, Plaintiff would either face the decision to abandon its tender offer or

7  proceed with the offer and face losing the intended benefit of offer, *i.e.*, voting rights and

8  potential merger.  See <u>Tyson Foods</u>, 865 F.2d at 103 ("[S]ubjecting [tender offers] to an

9  unconstitutional application of [state laws regulation tender offers] amounts to irreparable

10  injury.") (quoting <u>Martin Marietta Corp. v. Bendix Corp.</u>, 690 F.2d 558, 568 (6th Cir. 1982)).

11  In addition, the fact that the stock value of Defendant's stock is currently trading above the

12  tender offer is not per se evidence that the tender offer will fail.  As stated above, to accept

13  Defendant's argument would require this Court to substitute its judgment as to the viability

14  of the offer for the judgment of the Defendant's shareholders.  Under such circumstances,

15  the Court finds that irreparable harm to Plaintiff would result based upon the application of

16  the Arizona statutes, in the absence of a preliminary injunction.[4]  Thus, the Court finds that

17  the irreparable harm element of Plaintiff's declaratory and injunctive suit is satisfied

18  supporting the issuance of a preliminary injunction enjoining the application of the Arizona

19  statutes.

20

21

22

23  _____

24  [4]At oral argument, Defendant cited <u>Black & Decker</u> to support its position that the
value of Plaintiff's tender offer was not viable or realistic thus negating the existence of

25  irreparable harm. 679 F.Supp.1183.  This Court does not find that the <u>Black & Decker</u>
holding somehow demonstrates the absence of the irreparable harm in this case.  For

26  instance, unlike <u>Black & Decker</u>, this Court is not dealing with irreparable harm based upon
possible consumer confusion regarding the constitutionality of the Arizona statues. <u>Id.</u> at

27  1193.  Rather, as explained above, based upon the reach and impact of the Arizona statutes,

28  Plaintiff's tender offer will be significantly frustrated in the absence of injunctive relief.

1

**(2)    Likelihood of Success on the Merits**

2   The Commerce Clause provides that "Congress shall have Power . . . [t]o regulate

3   Commerce ... among the several States." U.S. Const. art. I, § 8, cl.3.  The Supreme Court has

4   generally adopted "what amounts to a two-tiered approach to analyzing state economic

5   regulation under the Commerce Clause. When a state statute directly regulates or

6   discriminates against interstate commerce, or when its effect is to favor in-state economic

7   interests over out-of-state interests, [the Supreme Court] has generally struck down the

8   statute without further inquiry.  When . . . a statute has only indirect effects on interstate

9   commerce and regulates evenhandedly, [the Supreme Court] ha[s] examined whether the

10  State's interest is legitimate and whether the burden on interstate commerce clearly exceeds

11  the local benefits." <u>Brown-Forman Distillers Corp. v. New York State Liquor Auth</u>., 476

12  U.S. 573, 578-79 (1986) (citations omitted).  In addition, the Supreme Court in <u>CTS Corp</u>

13  <u>v. Dynamics Corp. of America,</u> set forth that its cases "also have invalidated statutes that

14  may adversely affect interstate commerce by subjecting activities to inconsistent

15  regulations." 481 U.S. 69, 88 (1987); <u>see also</u> <u>NCAA v. Miller</u>, 10 F.3d 633, 640 (9th Cir.

16  1993) (striking down Nevada statute "both because it regulates a product in interstate

17  commerce . . . <u>and</u> because it puts the NCAA . . . in jeopardy of being subject to inconsistent

18  legislation.") (Emphasis added).[5]

19  As noted above, the Arizona Control Share Act and Arizona Business Combination

20  Act apply to Defendant, a Delaware corporation, because Defendant, an "issuing public

21  corporation," under Arizona law, making its principal place of business in Arizona, with

22  significant assets in Arizona, employs a significant number of employees in Arizona and has

23  not opted out of the protection of the Arizona Anti-Takeover Act.  As such, the Defendant

24

25

26  [5] The Attorney General appears to argue that the risk of inconsistent regulation should be included with any court's analysis of whether the indirect regulation's burden exceeds the state's interest in implement such regulation.  See <u>Pike v. Bruce Church, Inc</u>., 397 U.S. 137,

27  142 (1970).  However, as noted in <u>CTS Corp</u>. such risk of inconsistent regulation amounts

28  to an independent basis to invalidate any law or statute.  481 U.S. at 88.

and tender offer, in its simplest terms, are currently impacted by the Arizona Anti-Takeover Act even though the tender offer is made by a Delaware corporation to that of another Delaware corporation. Precedent demonstrates that such regulation by a state upon a foreign corporation runs contrary to what the Commerce Clause permits. Specifically, Plaintiff asserts two challenges to the Arizona statutes: (1) that they are constitutionally flawed because they subject foreign target corporations such as Defendant Ventana and the tender offer to an impermissible risk of inconsistent regulation; and (2) that they are constitutionally defective because the burden on interstate commerce clearly outweighs any state interest in protecting target corporations and their Arizona shareholders. The Court finds both arguments provide independent grounds demonstrating the constitutional defect in the Arizona statues.

There is strong persuasive authority demonstrating that the Arizona statues constitute an impermissible risk of inconsistent regulation in violation of the Commerce Clause because of the statutes' reach and application to foreign corporations, such as Defendant. For instance, in <u>TLX</u>, the district court granted a tender offeror corporation's request for preliminary injunctive relief enjoining the enforcement of Oklahoma's Control Shares Act because it violated the Commerce Clause. 679 F.Supp. 1022 . The Oklahoma Control Share Act applied to its corporations as well as corporations with their principal place of business in Oklahoma. The district court invalidated the Oklahoma Act, on one ground, because it "create[d] an impermissible risk of inconsistent regulation of tender offers and voting rights in stock by different states" <u>Id.</u> at 1029. With respect to the inconsistency created, the district court stated that "[i]t follows that when a state attempts to regulate voting rights in corporations other than those it has created, such corporations will be subject to the law of more than one state, which poses an impermissible risk of inconsistent regulations by different states that may adversely affect interstate commerce." <u>Id.</u> at 1030. This Court finds such reasoning persuasive and applicable to the case at hand. Notably, the Arizona statues, like the Oklahoma statutes, apply to foreign corporations as well as Arizona corporations. Because of such broad application, there is an inherent risk of inconsistent regulation upon

1   Defendant between Arizona, the place of Defendant's principal place of business, and

2   Delaware, the place of Defendant's incorporation.  Moreover, as in <u>TLX</u>, Arizona's opt-out

3   provision, A.R.S. §§ 10-2721(A)(2), 10-2743(A)(2),  does not somehow eliminate the risk

4   of  inconsistent  regulation. 679 F.Supp. at 1031.   In  fact,  the  opt-out  provision  itself

5   "represents regulation of the internal affairs of a foreign corporation."  <u>Id.</u>

6       The Court also finds that the district court's decision in <u>Grand Metro</u>, supports the

7   existence of the risk of impermissible inconsistent regulation. 1988 WL 1045191.  In  <u>Grand</u>

8   <u>Metro</u>, the district court granted the offeror corporation's motion for preliminary injunction

9   to  enjoin  the  application  of  Florida's  Affiliated  Transaction  Act  and  Control  Share

10  Acquisition Act.  The Florida statutes, like the Arizona statues, applied to target corporations

11  that were incorporated in Florida as well as those that had their principal place of business

12  in Florida but were incorporated in other states.  <u>Id.</u> at * 2.   The district court found the

13  Florida statutes to run contrary to the Commerce Clause because the Florida statutes

14  purported to regulate "the internal affairs of out-of-state corporations even though Florida

15  [had] no legally cognizable interest in doing so . . . . [thus] the statutes create[d] the risk of

16  inconsistent regulation" which the court held to be an "intolerable burden on interstate

17  commerce." <u>Id.</u> at *6.  In light of the similarity of the circumstances surrounding the Arizona

18  statutes and those presented in <u>Grand Metro</u>, it would be inconsistent to find that the Arizona

19  statutes are somehow free from defect under a commerce clause analysis.  Because of the

20  Arizona statutes broad application to foreign corporations, they clearly create the risk of

21  inconsistent regulation which as acknowledged in <u>CTS Corp.</u>, is not acceptable under a

22  commerce clause analysis. 481 U.S. at 88.

23      The Court also finds instructive the distinguishing authority in the Supreme Court's

24  holding in <u>CTS Corp.</u> 481 U.S. 69.   In <u>CTS Corp.</u>, the Supreme Court upheld the

25  constitutionality of Indiana's Control Share Acquisition statute, which would impact the

26  voting rights of an acquiring corporation in the event of a takeover of a target corporation,

27  largely because the Indiana statute applied <u>only</u> to corporations organized under the laws of

28  Indiana.  The Supreme Court explained in pertinent part:

> So long as each State regulates voting rights only in the corporations it has created, each corporation will be subject to the law of only one State.  No principle of corporation law and practice is more firmly established than a State's authority to regulate domestic corporations, including the authority to define the voting rights of shareholders . . . Accordingly, we conclude that the Indiana Act does not create an impermissible risk of inconsistent regulation by different States.

Id. at 89 (emphasis added).

The instant case is obviously distinguishable from CTS Corp., because the Arizona statutes, unlike the Indiana statue in CTS Corp., do apply and regulate the affairs of foreign corporations, such as Defendant.  As clearly implied in CTS Corp., the "risk of inconsistent regulation" does exist in this case and is impermissible under the Commerce Clause.  Id.

In addition, there is strong authority demonstrating that the Arizona statutes violate the Commerce Clause because the burden on interstate commerce "is clearly excessive in relation to the putative local benefits" to Arizona.  See TLX, 679 F.Supp. at 1031 (quoting Pike, 397 U.S. at 142.  In this case the burden on interstate commerce created by the broad application of Arizona statues includes the frustration and regulation generated by a tender offer made to a foreign corporation, such as Defendant.  While Arizona clearly has an interest in protecting businesses that have significant contacts with Arizona, such as Defendant, Arizona clearly has "no interest in protecting nonresident shareholders of nonresident corporations."  MITE Corp., 457 U.S. at 644.   In balancing such competing interests, the interference with interstate commerce created by the regulation of a foreign corporation controls.  See, e.g., Id. at 644-45 (finding Illinois Business Takeover Act to violate Commerce Clause because benefit from any indirect regulation did not outweigh burden created on interstate commerce)[6]; Tyson Foods, 865 F.2d at 103 (finding Tennessee Control Share Acquisition Act and Business Combination Act to violate commerce clause because statutes constituted a burden on interstate commerce excessive in relation to local interests served by the statute); TLX 679 F.Supp. at 1029 (finding Oklahoma's Control Shares Act to

---

[6] Although the decision was a plurality, the Commerce Clause analysis finding the statute to be unconstitutional was joined by a majority of the justices with respect to the balancing analysis under Pike.

1   violate Commere Clause because it "impose[d] an indirect burden on interstate commerce

2   that is excessive in relation to Oklahoma's interest in protection of resident shareholders and

3   businesses."). The instant case, based upon the Arizona statutes and their application to

4   foreign corporations, is no different than the cases presented above as the Arizona statutes,

5   while protecting businesses with significant contacts with Arizona, unreasonably interfere

6   with interstate commerce based upon the regulation of businesses that are not incorporated

7   in Arizona.

8        In finding the Arizona statutes to run contrary to the Commerce Clause, the Court

9   finds unpersuasive the arguments advanced by the Arizona Attorney General, the only party

10  to argue that the Arizona statutes are constitutionally sound. The Attorney General relies

11  primarily on state law and avoids the overwhelming federal case law, cited above, indicating

12  that the Arizona statutes are constitutionally deficient  For instance, the Attorney General

13  first cites the Court to the California Court of Appeal's decision in Wilson v. Louisiana-

14  Pacific Res., Inc., where the court upheld the state regulation to foreign corporations based,

15  in part, upon the corporation's contacts with the state. 138 Cal.App.3d 216, 226-27 (1982).

16   However, this decision came before the Supreme Court's holdings in MITE and CTS Corp,

17  which call into question the validity of such a holding.  In addition, the Attorney General

18  relies upon State Farm Mut. Auto Ins. Co. v. Superior Court, where the California Court of

19  Appeal stated that "a California court can apply local law to a foreign corporation that has

20  sufficient contacts with the state, such as conducting business or having an office."   114

21  Cal.App.4th 434, 448 (2003).   However, the California court went on to hold that Illinois

22  law, the place of the foreign corporation's incorporation, applied and observed that "[i]n all

23  but a handful of cases, the law of the state of incorporation is applied to disputes involving

24  internal affairs in spite of the various choice-of-law theories." Id. [7]  In sum, the Court finds

25  that the Attorney General fails to controvert the strong authority suggesting that the Arizona

26

27        [7] At oral argument, the Attorney General acknowledged that it was unable to locate
   any federal authority to support its position regarding the constitutionality of the Arizona
28  statutes.

1  statutes violate the Commerce Clause based upon the risk of inconsistent regulation and the

2  balancing of burden and benefit on interstate commerce.

3      As such, the Court finds that Plaintiff has  made a strong showing of success on the

4  merits with respect to its challenge to the constitutionality of the Arizona Control Share Act

5  and Arizona Business Combination Act.

6              **(3)    Public Interest**

7      In addition to a high likelihood of success on the merits and existence of irreparable

8  harm, the Court is satisfied that enjoining the application of the Arizona statutes serves the

9  public interest.  The Court sees no benefit to the public in allowing the unconstitutional

10  application of the Arizona Control Shares Act and Arizona Business Combination Act to be

11  applied to frustrate the tender offer to Defendant.  See Tyson Foods, 865 F.2d at 103 ("[I]t

12  is not in the public interest to perpetuate the unconstitutional application of a statute.").

13  **IV.    Summary**

14      The Court finds that Plaintiff has presented a justiciable declaratory and injunctive

15  action challenging the constitutionality of the Arizona Control Share Act and the Arizona

16  Business Combination Act.  In addition, based upon a strong showing of a high likelihood

17  of success on the merits, the existence of irreparable harm and consideration of the public

18  interest, the Court finds that it is appropriate to grant Plaintiff's Motion for preliminary

19  injunction enjoining the application of the Arizona statutes to the Defendant and tender offer.

20      **Accordingly,**

21      **IT IS HEREBY ORDERED** granting Plaintiff's Motion for preliminary injunction.

22  (Dkt.#3).

23      **IT IS FURTHER ORDERED** enjoining Defendant from taking any action to invoke,

24  apply, or enforce the provisions of the Arizona Control Share Act, A.R.S. §§ 10-2721

25  through 10-2727, and the Arizona Business Combination Act, A.R.S. §§ §§ 10-2741 through

26  10-2743, with respect to Plaintiff's tender offer for all of Defendant's outstanding shares of

27  common stock commenced on June 27, 2007.

28

1    DATED this 22nd day of August, 2007.

2

3

4    _____

5    Mary H. Murgula
     United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28